**MEDITECH INTERNATIONAL COMPANY, Plaintiff,**

v.

**MINIGRIP, INC., Defendant.**

**No. 86 C 4211.**

United States District Court,
N.D. Illinois, E.D.

Dec. 5, 1986.

Robert E. Wagner, Leo J. Aubel, Alan L. Barry, Amy L. Rockwell, Wallenstein, Wagner, Hattis, Strampel & Aubel, Ltd., Chicago, Ill., for plaintiff.

William J. Campbell, Jr., Barry Ginsberg, Margaret S. Determan, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Meditech International Company ("Meditech") has sued Minigrip, Inc. ("Minigrip"), alleging violations of Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1 and 2, and part of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a).[1] Minigrip has now moved for dismissal under Fed.R.Civ.P. ("Rule") 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(6) (failure to state a claim). For the reasons stated in this memorandum opinion and order:

---

1. Further citations will take the form "RICO § —," referring to the Title 18 numbering.

1. Minigrip's Rule 12(b)(1) motion is denied for the present.

2. Ruling on its Rule 12(b)(6) motion is deferred.

3. This action is stayed.

### Facts [2]

Meditech, a Colorado corporation, markets and distributes specialty plastic devices for a variety of medical uses (¶ 22). Minigrip, a New York corporation, manufactures and sells reclosable plastic bags (¶ 5). In connection with that business Minigrip has owned four patents (collectively the "Patents") [3] (¶¶ 5–7; Minigrip Mem. 5):

1. RE 28,969 ("Patent 1," issued August 3, 1965 as No. 3,198,228 and reissued with current number September 21, 1976) expired August 3, 1982.

2. RE 26,991 ("Patent 2," issued May 16, 1967 as No. 3,320,340 and reissued with current number November 24, 1970) expired May 16, 1984.

3. RE 29,208 ("Patent 3," issued September 5, 1967 as No. 3,340,116 and reissued with current number May 10, 1977) expired September 5, 1984.

4. RE 28,959 ("Patent 4," issued December 1, 1970 as No. 3,543,379 and reissued with current number September 14, 1976) remains in effect until December 1, 1987.

Patent 1 disclosed a type of reclosable plastic bag, while Patents 2, 3 and 4 relate to the equipment and methods used to produce that bag (¶ 5).

Minigrip licenses the Patents to Dow Chemical Corporation ("Dow"). Dow manufactures plastic reclosable tubing and sells reclosable plastic bags in the consumer market under the trademark "ZIPLOC." Minigrip also sells plastic tubing to KCL Corporation ("KCL") and Millhiser, Inc. ("Millhiser"), which then convert the plastic tubing into reclosable plastic bags and compete directly with Minigrip in the sale of the bags in the industrial market (¶¶ 10–11; Minigrip Mem. 3).

On October 20, 1975 Minigrip filed a complaint with the United States International Trade Commission ("Commission") under Tariff Act of 1930 ("Act") § 337, 19 U.S.C. § 1337,[4] charging the unauthorized importation and sale by several domestic and foreign companies (not including Meditech) of reclosable plastic bags that, if produced in the United States, would infringe Patent 1. Act § 1337(a) provides:

> Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provisions of law, as provided in this section.[5]

Act § 1337(b) authorizes Commission to "investigate any alleged violation of this section on complaint under oath or upon its

---

**2.** Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in Meditech's favor. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). All citations to the Complaint will simply take the form "¶ —." Though this Court could also consider matters outside the pleadings for Rule 12(b)(1) purposes (*Crawford v. United States,* 796 F.2d 924, 928–29 (7th Cir.1986)), nothing relevant has been submitted in that respect.

**3.** While ¶ 5 says Minigrip is the "assignee and licensee" of the Patents (really mutually inconsistent terms), Minigrip Mem. 2 n. 2 says Mini-

grip actually owns the Patents. Nothing flows from the distinction for purposes of this motion.

**4.** Though the relevant regulations refer to Act sections in terms of Act's internal numbering rather than Title 19's numbering, because the two sets of numbers differ by exactly 1000 (and hence only in the first digit), this opinion will follow the Title 19 numbering.

**5.** [Footnote by this Court] This opinion later treats with the content to be given the terms "unfair methods of competition and unfair acts in the importation of articles."

initiative," and Act § 1337(c) provides procedures for doing so:

> The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section. Each determination ... shall be made on the record after notice and opportunity for a hearing.... All legal and equitable defenses may be presented in all cases.

After conducting an investigation and hearing, Commission concluded imported plastic bags would infringe Patent 1 if produced in the United States (*In re Reclosable Plastic Bags*, No. 337–TA–22, 192 U.S. P.Q. (BNA) 674 (USITC 1977)) ("Order TA–22"). In reaching its conclusion Commission rejected several proffered defenses, including alleged violations of the antitrust laws (*id.* at 678–80). Commission observed (*id.* at 681):

> Further, it is to be remembered that the essential patent right of a patentee is the right to exclude others from making, using, or selling its patented product in the United States for a fixed period of years.

As a remedy for the unfair acts, Commission excluded the unlicensed articles from entry into the United States for the term of Patent 1 (*id.* at 681). That authority is provided Commission in Act § 1337(d):

> If the Commission determines, as a result of an investigation under this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry.

6. According to Commission, *id.* at 351 no respondents appeared at the evidentiary hearing. Commission's primary source of evidence of patent infringement was Ausnit, who provided evidence acquired through visits to the facilities

Meditech charges (1) Minigrip "knowingly withheld from Commission the disclosures of [Patents 2, 3 and 4] although these disclosures were relevant and material to [Commission's] investigation" (¶ 16) and (2) Order TA–22 was overbroad (¶ 37). In addition, Meditech asserts that although Order TA–22 excluded only reclosable plastic bags using a specific kind of structure, the United States Customs Service ("Customs") enforced that order (¶ 15):

> in such an overly broad manner so as to exclude all reclosable plastic bags regardless of the closure profile, which included bags and profiles of bags in the public domain.

Once Order TA–22 was issued, Meditech claims Minigrip's President Steven Ausnit ("Ausnit") and others acting on behalf of Minigrip (¶ 21):

> warned the foreign suppliers that difficulties would result if they attempted to import either machinery or reclosable plastic bags to the United States.

Meditech continues (¶ 21):

> By its continuous communications with the Customs Service, MINIGRIP has insured that importation of equipment and reclosable plastic bags be halted. MINIGRIP's intimidation tactics and misrepresentations to the Customs Service is [sic] continuing even after the expiration of ORDER TA–22 and several MINIGRIP PATENTS.

On September 2, 1982 Commission issued a second Determination and Exclusion Order (*In re Certain Methods for Extruding Plastic Tubing*, No. 337–TA–110, 218 U.S. P.Q. (BNA) 348 (USITC 1982)) ("Order TA–110"), this time after Minigrip had alleged unauthorized importation by five domestic and ten foreign companies (not including Meditech) of plastic tubing and reclosable plastic bags that, if produced in the United States, would infringe Patents 2, 3 and 4 (Patent 1 had then expired).[6] To enforce

of the foreign manufacturers. In addition, Minigrip's patent expert rendered an opinion that infringement had occurred, based on evidence supplied by Ausnit.

Order TA–110, Commission devised a five point test (the "Five Point Customs Test") based on the visual characteristics of reclosable plastic bags covered by the Patents.[7] Customs uses the Five Point Customs Test in identifying imported bags that infringe the Patents (¶ 18).

Meditech challenges the validity of the Five Point Customs Test, claiming it (¶ 19):

is overbroad and unlawfully extends the scope of protection of the reclosable plastic bag manufacturing method and mechanism patents underlying ORDER TA–110, by covering known and old reclosable bag manufacturing methods and techniques.

Meditech also charges Minigrip "knew or should have known" the Five Point Customs Test was overbroad, yet (¶ 20):

Despite this knowledge, MINIGRIP, through its employees, agents and legal representatives, actively manipulated [Commission] to adopt the FIVE POINT CUSTOMS TEST for ORDER TA–110 which effectively continued the overly-broad enforcement of ORDER TA–22.[8]

Pointing out two of the three Patents protected in Order TA–110 have now expired, Meditech charges Order TA–110 is "inherently anti-competitive" and "constitutes a continuing restraint on trade" (¶ 37).

Almost three years after Order TA–110 was issued, Meditech attempted for the first time to import plastic reclosable bags as part of a plan to begin marketing those bags in the United States for consumer and industrial uses (¶ 22). That effort was thwarted when Customs applied the Five Point Customs Test and refused entry of two shipments of reclosable plastic bags

from Chung Kong Industrial Co., Ltd. of Hong Kong ("Chung Kong bags") on June 4 and July 8, 1985 (¶ 23). At that time only Patent 4 remained in effect.

Meditech complains Customs took those actions (¶ 23):

[d]espite MEDITECH's efforts to explain to the import specialist that the reclosable plastic bags it sought entry for were produced under different manufacturing processes than the processes referenced by ORDER TA–110....

Soon after (in July 1985) Meditech sought to discuss with Minigrip the refusal by Customs to admit the Chung Kong bags (¶ 24). Meditech says it also (*id.*):

attempted to explain to MINIGRIP's counsel that the single unexpired patent did not read on or cover the bags imported by MEDITECH.[9]

Because Minigrip's counsel was "unreceptive" (*id.*), on September 11, 1985 Meditech asked Commission for an advisory opinion exempting the Chung Kong bags from Order TA–110 (¶ 25)—a procedure authorized by 19 C.F.R. § 211.54(b) [10]:

Upon request of a respondent, the Commission may, upon such investigation as it deems necessary, issue an advisory opinion as to whether a respondent's proposed new course of action or conduct would violate the Commission order or section 337.

Commission's formal notice of its investigation into that matter (50 Fed.Reg. 45,173 (1985)) observes two of the three Patents protected by Order TA–110 have expired.

On March 4, 1986 Meditech withdrew its request for that opinion, asking instead for

---

7. Commission, *id.* at 352 said:

Finally, the uncontested testimony of [Ausnit and Minigrip's patent expert] establishes that bags made from extruded plastic tubing produced in accordance with the patented methods can, by a simple inspection, by [sic] readily identified by the presence of specified characteristics....

Commission, *id.* at 356–57 set out those characteristics, and Customs imported them verbatim into the Five Point Customs Test.

8. [Footnote by this Court] Meditech also says (¶ 18) Customs "improperly enforced" the Five Point Customs Test "at the urging of MINIGRIP" by "refusing entry of imported reclosable plastic bags."

9. [Footnote by this Court] Minigrip Mem. 5 says Meditech tried to persuade Minigrip to relinquish its patent rights.

10. Regulations drawn from 19 C.F.R. will be cited "Reg. § —."

an advisory opinion that an alternative manufacturing method it had developed for reclosable bags ("which would even more clearly avoid infringement of [Patent 4]") would not be excluded under Order TA–110 (¶ 26; Minigrip Mem. 6). On April 9, 1986 Commission gave notice of its decision to terminate the first proceeding with prejudice and commence the second proceeding (51 Fed.Reg. 12,219 (1986)).

Commission's second proceeding is still pending (¶ 26). However, Meditech complains that proceeding is unfair due to Minigrip's unlawful conduct:

29. Throughout [that] proceeding, MINIGRIP and LEVY have intentionally manipulated [Commission] as to the issues of the current investigation. The real issue should be whether MEDITECH's reclosable plastic bags are made by a process which infringes [Patent 4]. However, LEVY [Gerald Levy ("Levy"), a lawyer for Minigrip], who is a patent attorney, has intentionally manipulated [Commission] into believing that *no* reclosable plastic bags can be produced in any other manner than that disclosed by the MINIGRIP PATENTS ... Such activity, in addition to other acts, has effectively delayed and trivialized the [Commission] proceeding, much to the damage of MEDITECH and others.

30. It is believed that MINIGRIP and LEVY have improperly forwarded to the Customs Service correspondence concerning the current investigatory proceeding received by LEVY from [Commission], even though such correspondence was not meant for the Customs Service's review. Further, it is believed that LEVY has communicated by phone with [Commission] and Customs Service to influence the agencies, resulting in the continuing enforcement of the overbroad ORDER TA–110, thereby unlawfully extending the scope of its remaining patent ... and causing the redelivery of shipments of non-infringing reclosable plastic bags, to the expense and injury of MEDITECH.

31. LEVY's demands and consultations with personnel of [Commission] and the Customs Service have stalled the determination of the true issue of the current [Commission] investigation. Even though MEDITECH offered to pay for an impartial outside patent attorney to provide an expert opinion to expedite and complement [Commission's] consideration of [the issue], [Commission] did not accept the offer.

35(d). [T]hrough LEVY's misrepresentations, LEVY and MINIGRIP have effectively foreclosed MEDITECH from equal consideration by [Commission] and Customs Service for MEDITECH's importation of reclosable plastic bags which do not infringe the MINIGRIP PATENTS, in particular [Patent 4]. . . .

One final matter of which Meditech complains relates to a third method for making reclosable bags (called the "folded top process"), which Meditech has developed and is the subject of its own patent application (¶ 27). Meditech says it provided Customs with samples of bags made by the folded top process and asked Customs to issue a "supplemental circular" permitting importation of such bags (*id.*). Although Customs personnel allegedly gave oral approval to that request January 9, 1986, the circular has not been issued (*id.*). Meditech asserts that is because of Commission's and Customs' "misunderstandings" concerning what Patent 4 covers and what Order TA–110 excludes (¶ 28). Those misunderstandings, Meditech says, were caused by Minigrip (*id.*):

Rather, on information and belief, Minigrip, through its employees and agents, including AUSNIT and its legal representative Gerald Levy ... have purposely lead [sic] the Customs Service and [Commission] to such misunderstandings.

## Contentions of the Parties

Based on those allegations, Meditech advances two causes of action:

1. Beginning at least as early as 1976 and continuing until the present, Minigrip has unlawfully combined with other entities (including but not limited to

Levy, KCL, Millhiser and various Customs and Commission personnel) unreasonably to restrain and monopolize interstate commerce in the manufacture, marketing and sale of reclosable plastic bags, in violation of Sherman Act §§ 1 and 2 (¶¶ 33 and 35).

2. Minigrip engaged in a pattern of racketeering activity to defraud Commission, Customs, Meditech and other parties, with the goal of misleading those targets as to the scope of the Patents, in violation of RICO § 1962(a) (¶¶ 43, 45–49).

Minigrip seeks dismissal on two grounds:

1. lack of subject matter jurisdiction, based (among other theories) on the doctrine of primary jurisdiction; and

2. failure to state a claim upon which relief may be granted under either the Sherman Act or RICO.

Minigrip is right about the applicability of primary jurisdiction theory, which requires that Commission first be allowed to examine and resolve questions raised by Meditech's claims and coming within Commission's area of expertise. Minigrip is simply wrong, though, in characterizing that as a jurisdictional flaw. Consequently, as the ensuing discussion shows, what is called for is not dismissal but a stay of this action.[11]

### Primary Jurisdiction

■ *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956) (citation omitted) aptly describes primary jurisdiction doctrine:

"Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views....

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.

That doctrine mandates a stay of this action, because Meditech claims Minigrip violated the Sherman Act and RICO in part by unlawfully influencing Commission to issue overbroad exclusion orders. Had Minigrip not done so, Meditech urges, Commission would not have erroneously excluded Meditech's (and other companies') plastic reclosable bags from entry into the United States. To decide those claims this Court would have to determine:

1. whether Commission Order TA–110 is (and has been since its issuance) overbroad; and

2. if the answer to question 1 is "yes," whether that overbreadth is due to Minigrip's allegedly unlawful conduct in misleading Commission.

Under the doctrine of primary jurisdiction, Commission and not this Court should, in the first instance, resolve those questions.

■ District courts have "no jurisdiction over the importation of articles in commerce" as such (*Ashlow Ltd. v. Morgan Construction Co.*, 672 F.2d 371, 375 (4th Cir.1981) (per curiam)). Congress has created a comprehensive regulatory scheme under which Commission, an administrative body with special competence in the field of

---

**11.** This Court is of course not unmindful of the threshold nature of a challenge to subject matter jurisdiction. In this instance, however, that challenge is based on (1) the exclusivity of Commission jurisdiction over unfair trade practices in foreign commerce and (2) the exclusivity of Court of Appeals for the Federal Circuit jurisdiction over Commission decisions in that respect. If those routes are traveled—if those exclusive remedies are exhausted—*before* Meditech resorts to this Court's normal jurisdiction over federal claims under the antitrust laws and RICO, it would appear most likely that subject matter jurisdiction over the latter claims would exist—though that may perhaps depend on the shape of the case after those other routes are pursued. Hence the primary jurisdiction issue should be and is addressed first.

international trade, is given jurisdiction over unfair trade practices in such importation (*Tompkins Seals, Inc. v. West Co.*, 229 U.S.P.Q. (BNA) 469, 471 (E.D.Pa.1985)), [Available on WESTLAW, DCTU database].[12] Commission is empowered not only to issue orders (such as TA–22 and TA–110) excluding articles from entry into the United States but also to modify or dissolve such exclusion orders under certain circumstances (Reg. § 211.57):

> (a) Whenever any person believes that changed conditions of fact or law, or the public interest, require that a final Commission act be modified or set aside, in whole or in part, such person may file with the Commission a motion requesting such relief. The Commission may also on its own initiative consider such action. The motion shall state the changes desired and the changed circumstances warranting such action, and shall include materials and argument in support thereof.
>
> (b) Upon receiving a motion, the Commission shall either (1) provisionally accept the motion or (2) reject the motion.... Within thirty (30) days after the service of such motion, any party served may file an answer. The Commission may hold a public hearing and afford interested persons the opportunity to appear and be heard.

Once Commission has rendered a final determination, it may be appealed only to the Court of Appeals for the Federal Circuit (Act § 1337(c)):

> Any person adversely affected by a final determination of the Commission ... may appeal such determination, within 60 days after the determination becomes final, to the United States Court of Appeals for the Federal Circuit for review....[13]

In light of that carefully-crafted regulatory structure, it would be entirely inappropriate for this Court to resolve questions within Commission's special competence before Commission has had the opportunity even to examine those issues. After all, Commission promulgated Order TA–110 based on the record tendered to it. Surely Commission is best able to say whether it would have issued that order in its present form had it known of Minigrip's alleged misrepresentations. And Commission is likewise uniquely qualified to determine whether Order TA–110 has become overbroad (even if it was not initially) now that Patents 2 and 3 have expired.

Meditech Mem. 4 misses the mark when it argues this Court should nevertheless examine the claims before it because Commission cannot address *all* of the issues raised or award the damages it seeks. Indeed those very arguments were rejected in a case involving allegations startlingly parallel to Meditech's: *Alberta Gas Chemicals, Ltd. v. Celanese Corp.*, 650 F.2d 9 (2d

---

**12.** *Ashlow,* 672 F.2d at 372 says:

> While [Act § 1337] does not identify the particular actions which may constitute "unfair methods of competition and unfair acts in the importation of articles," it has repeatedly decided that the importation of an article which infringes a valid domestic patent constitutes an "unfair act" under the statute.

With respect to a patented "process," Act § 1337a (as distinguished from Act § 1337(a)) expressly provides:

> The importation for use, sale, or exchange of a product made, produced, processed, or mined under or by means of a process covered by the claims of any unexpired valid United States letters patent, shall have the same status for the purposes of section 1337 of this title as the importation of any product or article covered by the claims of any unexpired valid United States letters patent.

**13.** [Footnote by this Court] Until 1982 Commission determinations were reviewed by the court named (until 1980) the Court of Customs and Patent Appeals and then called the Court of International Trade, Patents, and Trademarks. In 1982 that court was abolished and the Court of Appeals for the Federal Circuit was created to assume the appellate functions of both the Court of International Trade, Patents and Trademarks and the Court of Claims. As 17 Wright & Miller, *Federal Practice and Procedure: Jurisdiction* § 4104, at 92 (1986 pocket part) (footnote omitted) explains:

> By this means Congress sought to create a permanent and more efficient forum capable of exercising nationwide jurisdiction over appeals in those categories of cases in which there have been problems of doctrinal inconsistency.

Cir.), *on remand,* 529 F.Supp. 226 (S.D.N.Y.1981), *aff'd mem.,* 697 F.2d 287 (2d Cir.), *cert. denied,* 459 U.S. 1092, 103 S.Ct. 580, 74 L.Ed.2d 939 (1982).[14] There Alberta had sued Celanese in the District Court (see 497 F.Supp. 637 (S.D.N.Y.1980)) for alleged fraud and unfair competition, accusing Celanese (like Minigrip here) of intentionally misleading Commission by misrepresentations and failure to disclose information in Commission proceedings—thus causing Commission to render a decision detrimental to Alberta (*id.* at 638–39).[15]

After the District Court had dismissed the case for failure to state a claim (*id.* at 641 [16]), the Court of Appeals reversed and remanded (650 F.2d at 14):

> with instructions to stay all proceedings ... until such time as the Commission determines whether (1) Celanese employees did commit perjury during the [Commission proceeding], and (2) whether but for such perjury, the Commission would have reached a different conclusion....

That decision was predicated on Commission's special expertise to resolve those questions (*id.* at 12) (citation omitted):

> It is quite clear to us that Alberta is trying to obtain a reversal of the Commission's ruling without bothering to at-

tempt to utilize other remedies available to it, and we see no reason to countenance such use of the federal courts.

\*　\*　\*　\*　\*　\*

Moreover, to prove that it suffered damage from the alleged perjury, Alberta must show that this testimony influenced the Commission to come to a result it would not otherwise have reached. Without that connection, Alberta's damages would be caused by the legitimate action of the Commission, and not by the allegedly tortious conduct by Celanese.

Under the circumstances, it makes good sense to allow the Commission to determine initially whether there was perjury and if there was, whether the perjury affected the result before the Commission. There can be little doubt that the Commission's "insight gained through experience" ... will be helpful in determining whether Celanese employees misrepresented the estimated United States demand for methanol and Celanese's intentions concerning the construction of additional production facilities. Resolution of such questions will be materially aided by the Commission's knowledge of how such estimates and projections are

**14.** Given the ease of retrieval of the *Alberta Gas* case via Lexis (a research tool Minigrip specifically used in providing this Court with some less relevant authority), it is troubling that neither litigant cited such a squarely applicable precedent (or, for that matter, the relevant *Nike* case referred to later in the text). Instead, this Court's law clerk Sheila Finnegan uncovered both those authorities.

**15.** Each company was the largest methanol producer in its own country: Alberta in Canada and Celanese in the United States. In March 1979 our Treasury Department concluded Canadian methanol exported by Alberta was being sold in the United States at less than fair value. That finding triggered hearings before Commission under the Antidumping Act, 19 U.S.C. §§ 160–171, to determine whether such sales were injuring or likely to injure the American methanol industry. Alberta's lawsuit charged Celanese employees had perjured themselves during those hearings by failing to disclose certain information and by deliberately underestimating the projected United States demand for methanol, thus causing Commission to find Ca-

nadian methanol imports likely to injure the United States' methanol-producing industry in the future. That finding led the Treasury Department to subject Alberta's future imports to a special dumping duty.

**16.** However, the court, *id.* at 641 (citations omitted) said even if Alberta Gas had stated a cause of action over which the court had jurisdiction, it would have stayed the action under the primary jurisdiction doctrine because:

> The central issue in this case is whether, but for Celanese's alleged misrepresentations, the Commission would have refused to impose dumping duties upon Alberta Gas. Rather than second-guessing the Commission, we would stay action pending Commission's redetermination of its decision. A finding by the Commission that its order was appropriate despite the purported misrepresentations would preclude plaintiff from establishing the requisite causation.... The claim that, by placing perjured testimony before the Commission, Celanese caused it to reach an erroneous result belongs in the federal administrative process....

customarily calculated, utilized, and revised, by its intimate familiarity with the record of the entire antidumping proceeding, and by its expertise in the field of international commerce. Moreover, the Commission will certainly be in a far better position than the district court to determine whether it would have reached a different conclusion but for the allegedly perjured testimony.

Parallel reasoning, of course, applies here. And two other aspects of the *Alberta Gas* analysis are equally relevant. First, the Court of Appeals, *id.* at 12–13 held Commission has inherent power to correct its own errors—especially when those errors are caused by fraud—to protect the integrity of its proceedings.[17] Finally, the Court of Appeals rejected Alberta's argument the District Court should decide the claims immediately because Commission had no power to award damages (*id.* at 13–14) (citations omitted):

> This argument misperceives the nature of the doctrine of primary jurisdiction. As Professor Davis points out, "[t]he test is not whether some parts of the case are within the exclusive jurisdiction of the courts; the test is whether some parts of the case are within the exclusive jurisdiction of the agency. Because of the purpose of the doctrine—to assure that the agency will not be by-passed on what is especially committed to it—and because the resort to the courts is still open after the agency has acted, the doctrine applies even if the agency has no jurisdiction to grant the relief sought." [2 K. Davis, *Administrative Law Treatise*] § 19.07 at 39 [(1958)]. The Supreme Court has consistently followed this approach by remanding cases for initial resolution by administrative

agencies, when it was undisputed that those agencies did not have the power to award the damages sought in the federal court action.

Accord (though not relied on in *Alberta Gas*), *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (upholding our Court of Appeals' stay of an antitrust suit until the Commodity Exchange Commission could decide whether defendants had violated Commodity Exchange Act rules—the predicate for the antitrust suit); see also *Nike, Inc. v. Rubber Manufacturers Association, Inc.*, 509 F.Supp. 912, 914, 916–18 (S.D.N.Y.1981) (antitrust action stayed under doctrine of primary jurisdiction where importer alleged defendants made false certifications, thus causing Customs to impose excessive duties).

In sum, for the reasons so aptly identified in *Alberta Gas*, this Court finds Meditech's arguments as to the asserted overbreadth of Order TA–110 (and the cause of that overbreadth) must first be tendered to Commission. If Meditech has evidence that Minigrip has misled or is now misleading Commission by not disclosing relevant information or other acts, that evidence too must be put to Commission. If Commission nevertheless "misunderstands" the scope of Minigrip's remaining Patent, Meditech must seek review in the Court of Appeals for the Federal Circuit.[18] For this Court the issue is one of jurisdiction deferred, not jurisdiction denied.

### Conclusion

Minigrip's motion to dismiss is denied. This action is stayed pending resolution by Commission (and, if review is required, by the Court of Appeals for the Federal Cir-

---

**17.** To that end the court noted (*id.*) that the "universally accepted" equity rule, under which a federal court has "inherent power ... to investigate whether a judgment was obtained by fraud," has been applied to proceedings before federal administrative bodies.

**18.** Of course this Court recognizes part of Meditech's claim attacks the integrity of Commission's current proceeding (¶¶ 29–31). But more accurately, Meditech lays any asserted conspira-

torial activity at the door of Commission and Customs personnel (¶ 33), and not the agencies themselves. Meditech is free to bring those charges to Commission directly. Then that issue, to the extent (if any) it remains after Commission acts, may be placed before the Court of Appeals (obviously no opinion is now expressed on its possible later maintainability—or sustainability—in this Court).

cuit) of the issues identified in this opinion. To avoid the need for periodic status reports here while that process proceeds, however, Meditech may want to consider a current without-prejudice dismissal of this action with unqualified leave to reinstate.